Filed 9/2/25  State Department of State Hospitals at Coalinga v. B.Y. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE DEPARTMENT OF STATE HOSPITALS AT COALINGA, | F089008 |
| Plaintiff and Respondent, | (Super. Ct. No. 24CRAD687496) |
| v. | |
| B.Y., | **OPINION** |
| Defendant and Appellant. | |

### THE COURT[*]

APPEAL from an order of the Superior Court of Fresno County.  Amy K. Guerra, Judge.

Rudy Kraft, under the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Cheryl L. Feiner, Assistant Attorney General, Gregory D. Brown and Sierra E. Killian, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Detjen, Acting P. J., Meehan, J. and DeSantos, J.

Appellant B.Y. is an individual admitted to the State Department of State Hospitals (DSH) at Coalinga (DSH-Coalinga) under the Sexually Violent Predator Act (Welf. & Inst. Code, § 6600 et seq.).[1]  B.Y. appeals the trial court's order granting a petition by respondent, DSH, to renew for one year the involuntary treatment of B.Y. with antipsychotic medications.  B.Y. contends substantial evidence does not support the court's finding he was incompetent to make his own medical decisions.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

B.Y. was admitted to DSH-Coalinga as a sexually violent predator (SVP)[2] in 2006.  On June 30, 2023, DSH petitioned the trial court to involuntarily treat B.Y. with antipsychotic medications.[3]  On November 6, 2023, the court granted the petition and ordered B.Y. be involuntarily treated.

In August 2024, DSH petitioned the trial court to renew the order compelling B.Y.'s involuntary medication for another year.  The petition specified B.Y. has been diagnosed with bipolar disorder, pedophilic disorder, and antisocial personality disorder.  He suffers from hyperactivity, grandiose and persecutory delusions, sexual fantasies and urges involving prepubescent children, among other allegations.  B.Y. also has a history of stating he is connected with the mafia, as well as incidents of verbal aggression toward his peers and staff, and a physical altercation with a peer.  He does not believe he suffers

---

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

[2]    Under the Sexually Violent Predator Act (§ 6600 et seq.), a convicted sex offender may be declared an SVP and be civilly committed upon completion of the criminal sentence.  (*People v. Superior Court* (*Troyer*) (2015) 240 Cal.App.4th 654, 657.)  A petition to commit someone as an SVP requires two mental health evaluators to agree the person in question is an SVP and is likely to engage in acts of sexual violence without appropriate treatment and custody.  (*Ibid.*; see also § 6601, subds. (d)–(i).)

[3]    " 'Antipsychotic medication' means any medication customarily prescribed for the treatment of symptoms of psychoses and other severe mental and emotional disorders." (§ 5008, subd. (*l*).)

from a mental illness or needs antipsychotic medications.

The trial court appointed the public defender to represent B.Y. and ordered DSH-Coalinga to provide all medical records to the public defender's office. A hearing on the petition was set for November 4, 2024.

At the November 4, 2024 hearing, the parties stipulated to bifurcate the issues of B.Y.'s capacity and dangerousness, and address his capacity first. The parties further stipulated to the qualification of Dr. Rashed Rumi as an expert in the field of psychiatric treatment.

Rumi testified at the hearing. He has been B.Y.'s treating psychiatrist since June 2023. He typically meets with B.Y. once a month. B.Y. is "pretty consistent" in attending these meetings. Rumi and B.Y. last met on November 1, a few days before the hearing. That meeting lasted about 15 or 20 minutes.

Rumi testified B.Y. has been diagnosed with bipolar disorder. His symptoms before being on medication included hyperverbal speech, hyperactivity, agitation, irritability, increased impulsivity, lack of sleep, and grandiose delusions. During his manic episodes, B.Y. was observed pacing in the hallways. He had increased paranoia and made statements he was associated with the mafia. B.Y. threatened to harm others including staff. He was currently prescribed an antipsychotic medication, Abilify Maintena, a long-lasting injection B.Y. received once a month. Most of B.Y.'s symptoms have improved significantly from taking Abilify.

Rumi testified B.Y. does not believe he has a mental illness. B.Y. also does not believe he requires treatment with medication and was only compliant with taking medication because of the involuntary medication order. Rumi opined B.Y. does not understand the benefits and risks of treatment and is not capable of participating in any treatment decisions in a meaningful way.

On cross-examination, Rumi confirmed B.Y. has complained about chronic low energy from the medication. B.Y. made those complaints in the past on different

3.

medications as well. Rumi denied B.Y. has complained about any other negative side effects. He has not told Rumi his right arm locks up due to taking Abilify. Rumi testified B.Y. exhibits anosognosia which does not allow him to recognize his mental illness and need for treatment. Anosognosia is not a condition, but a symptom commonly seen in patients with neurodegenerative disorders like B.Y.'s bipolar disorder. Rumi opined B.Y. may in the future be able to gain insight into his condition and appreciate the risks and benefits of taking medication, but it was difficult to prognosticate when that would occur.

B.Y. testified on his own behalf at the hearing. He does not believe the Abilify helps him in any way. The medication "makes [him] lay in bed all day," "really drowsy," and gives him a lack of motivation to do anything. B.Y. believes he is overmedicated. He has gained weight due to these side effects and skips meals to lose weight. He is prediabetic.

B.Y. believes his right arm locks up on him from lack of use and laying in bed all the time. He has reported the issues with his right arm locking up and feeling drowsy to Rumi. B.Y. said Rumi was being untruthful when he denied during his testimony that B.Y. had reported the issue with his arm.

When asked what Rumi's diagnosis of bipolar disorder meant to him, B.Y. testified it was "a ridiculous notion to think that [he is] mentally ill, based on undocumented actions in the past." He then discussed an incident between him and a male staff member at the hospital. On further prompting, B.Y. stated the diagnosis "mean[s] that [he has] highs and lows" where he has "manic symptoms" and "episodes where [he] just go[es] off on staff for no reason."

B.Y. has talked to Rumi about taking him off the medication for six months to see how he feels and to prove he does not need the medication. Alternatively, B.Y. would propose a medication that does not make him so drowsy. B.Y. claimed "[t]his is ridiculous" he "can't do anything" and has no energy. He just lays in bed all day. B.Y. testified all the other medications have the same side effects for bipolar disorder but he is

"not [b]ipolar." The threats he made toward staff in the past were in response to staff threats toward him and B.Y. made his last threat because he wanted to go back to prison. Specifically, B.Y. made a threat in the hallway in front of a doctor's office because he wanted to be charged and go back to prison rather "than have chemicals infused in [his] body every month for some dystopic disorder that [he doesn't] have."

Regarding his statements he belonged to the mafia, B.Y. said that between 1991 until 1994 he worked for Ed Limato who "was mixed up with the mob." Limato "took care" of him while B.Y. was in prison from 1994 until 2010 by sending money and packages. B.Y. denied he is part of the mafia.

On cross-examination, B.Y. said he does not believe he has any mental illness. He understands he needs to be on some kind of medication but does not believe he needs to be on Abilify which just makes him lay in bed all day. B.Y. used to hear voices when he was in prison but has not heard voices in years. He was diagnosed with schizoaffective disorder while in prison and chose to take Abilify because his mother was taking the medication and said it might help. He had previously been on Geodon and was put on Abilify.

During further examination by defense counsel, Rumi testified he did not recall B.Y. talking about the right arm but he and B.Y. talked about B.Y.'s low energy several times. When B.Y. was on Geodon, he had symptoms of difficulty swallowing, difficulty talking, and auditory hallucinations. Rumi discussed another long-acting injection called Invega Sustenna with B.Y. but after B.Y. read the packaging instructions he chose not to be on that medication and to "stick with Abilify." Rumi does not believe B.Y. understands he has a mental illness that needs treatment or why he needs medication. The symptoms B.Y. has described have not been observed objectively by staff as he has been seen socializing with staff, eating his meals and performing activities of daily living. Rumi opined patients with similar disorders perceive their new normal as low and lethargic because they often prefer the high energetic manic state. Rumi would not be

5.

able to have a meaningful discussion with B.Y. about this possibility because he does not believe he has a mental illness. Rumi opined that B.Y.'s statements he threatened staff volitionally and the mental illness component did not contribute is itself "a big false belief, which is a delusion."

After hearing both parties' arguments, the trial court acknowledged DSH has the burden to show by clear and convincing evidence B.Y. lacks the capacity to make decisions as to medications and should have medication administered involuntarily. Based on Rumi's testimony, the court found B.Y.: (1) is not aware of the symptoms of psychosis and does not acknowledge the condition; (2) does not understand the benefits of the treatment alternatives or the proposed medication; and (3) does not understand or knowingly, intelligently, voluntarily, and rationally participate in the treatment decision. The court consequently found B.Y. lacks the capacity to make decisions about the medication and granted DSH's petition to involuntarily medicate B.Y. for one year. The order was issued that same day.

## DISCUSSION

B.Y. contends the involuntary medication order must be reversed because DSH failed to present substantial evidence he was not competent to make his own medical decisions. He claims his decision to refuse psychiatric medications of the type offered in the dosages being used was a perfectly rational response to the side effects from which he suffered.

A competent adult has a common law and constitutional right to refuse medical treatment including the administration of antipsychotic drugs. (*In re Qawi* (2004) 32 Cal.4th 1, 14.) Relatedly, "nonprisoners in California have a statutory right to refuse long-term treatment with psychotropic drugs absent a judicial determination that they are incompetent to do so." (*Keyhea v. Rushen* (1986) 178 Cal.App.3d 526, 541.) However, an involuntarily committed patient may be forcibly treated with antipsychotic medication if a trial court has determined he or she is not competent to refuse treatment. (*Qawi*, at

6.

pp. 9–10.) Based on *Qawi*, the Court of Appeal in *In re Calhoun* (2004) 121 Cal.App.4th 1315 held that an individual committed under the SVPA can be compelled to take antipsychotic medications in a nonemergency situation only where a court makes one of two findings: "(1) that the [SVP] is incompetent or incapable of making decisions about his medical treatment; *or* (2) that the [SVP] is dangerous within the meaning of … section 5300." (*Id*. at p. 1322.)

"The superior court shall determine competence to refuse treatment by clear and convincing evidence, 'so clear as to leave no substantial doubt, [and] sufficiently strong to command the unhesitating assent of every reasonable mind.' [Citation.] A judicial determination of competency to refuse treatment involves consideration of three factors: (1) whether the patient is aware of his situation and acknowledges the existence of his condition; (2) whether the patient understands the benefits and risks of treatment, as well as alternatives to treatment; and (3) whether the patient is able to understand and evaluate the information required to be given to patients whose informed consent is sought and participate in the treatment decision by rational thought processes." (*State Dept. of State Hospitals v. J.W.* (2018) 31 Cal.App.5th 334, 343–344, citing *Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1322–1323.)[4]

---

[4]     B.Y.'s appointed appellate counsel observes there is no published case addressing how these three factors "interrelate much less how the trial court should make its decision." Counsel states this court might wish to clarify how this three-factor test works. We are not convinced such clarification is necessary. Determining a patient's competency is necessarily a fact-driven inquiry because the evidence and circumstances will vary from case-to-case. Like other multifactor analyses, the court considers all three factors in determining the overarching question of competency with no specific weight given to one factor over another. (See, e.g., *Chong v. Superior Court* (1997) 58 Cal.App.4th 1032, 1037 [the trial court considers private and public interest factors in determining whether to retain an action in California with no single factor being predominant]; *People v. Banks* (2015) 61 Cal.4th 788, 803 [the jury considers several factors none of which are dispositive in deciding if an accomplice was a major participant for purposes of the felony-murder special circumstance].)

"We review an order authorizing involuntary administration of antipsychotic medication for substantial evidence." (*People v. Fisher* (2009) 172 Cal.App.4th 1006, 1016.) Substantial evidence is "evidence which is reasonable, credible, and of solid value." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012.)

With respect to the first factor, the evidence shows B.Y. does not acknowledge the existence of his bipolar disorder. Rumi testified B.Y. does not believe he has a mental illness or needs treatment. He explained that anosognosia, a symptom of B.Y.'s bipolar disorder, does not allow B.Y. to recognize his mental illness or need for treatment. B.Y. in his own testimony denied he "is [b]ipolar." He recognized this condition would mean he has "highs and lows," where he "just go[es] off on staff for no reason," but then tried to rationalize his threats toward staff as unrelated to his disorder. As Rumi explained, this rationalization demonstrates B.Y.'s inability to accept how his conduct is related to his condition. B.Y. argues he is not a patient who completely and utterly denies having a mental illness, citing his understanding he needs some type of treatment and apparent acceptance of his previous schizoaffective disorder diagnosis. We are not persuaded B.Y.'s understanding he needs treatment equates to an acknowledgement of the existence of his mental illness, particularly given his repeated refusal to accept his bipolar disorder diagnosis. His implied acceptance of a previous psychiatric diagnosis does not equate to acceptance of the current diagnosis.

On the second factor, the evidence demonstrates B.Y. does not understand the benefits and risks of treatment. B.Y. not only denies he has a disorder but lacks the ability to see the prescribed medication is necessary to address his disorder. When B.Y. was asked how he interprets the highs and lows of bipolar disorder, he said he is having a low now because he is on Abilify. He then said with bipolar disorder "you're just calm and you're not having any type of episodes." This indicates even if B.Y. accepted his diagnosis, he would still believe he does not need treatment. While the Abilify causes him to have low energy, B.Y. does not appreciate how this treatment has been beneficial for his condition given his symptoms have improved since he began taking Abilify. Rumi testified B.Y.'s lethargy has not been observed by staff and patients with similar disorders can appear lethargic from missing their manic state. B.Y. contends Rumi did not provide any evidence this latter occurrence was happening to him. We recognize B.Y. offered a different portrayal of the cause and extent of his lethargic state, but we are obliged to view the record in the light most favorable to DSH as the prevailing party. Furthermore, it was for the trier of fact to resolve conflicting evidence on the factual issues in dispute. (*People v. Yeoman* (2003) 31 Cal.4th 93, 128 [the trier of fact weighs the evidence, resolves evidentiary conflicts, and determines the credibility of witnesses].) We do not second-guess the trial court's resolution of evidentiary conflicts on appeal.

B.Y. asserts, and we agree, the third factor overlaps somewhat with the other two factors. But we disagree with B.Y. there was no evidence in the record he would not have been able to make a rational decision about his treatment options. He can hardly be expected to rationally evaluate and participate in treatment decisions for a disorder he refuses to accept he suffers from. Rumi testified the prescribed medication has improved his symptoms but B.Y. is only compliant with taking medication because of the prior trial court order. Rumi reasonably concluded Abilify was a better treatment alternative to Geodon which caused B.Y. to have difficulty swallowing, difficulty talking, and auditory hallucinations. His desire to stop treatment altogether for six months to see how he feels

9.

and prove he does not need treatment demonstrates his inability to accept his diagnosis or need for treatment and is not indicative of rational thought processes regarding treatment. The evidence supports the court's finding B.Y. lacks the ability to knowingly and intelligently evaluate and participate in the treatment decision by rational thought processes.

We conclude there was substantial evidence from which the trial court could reasonably find it was highly probable B.Y. lacks the capacity to refuse treatment. We therefore reject B.Y.'s challenge to the sufficiency of the evidence.

## **DISPOSITION**

The order is affirmed.